Albert L. LIPSCOMB et al., Plaintiffs-Appellants Appellees,

v.

The Honorable Wes WISE, Mayor of the City of Dallas, et al., etc. Defendants-Appellees,

v.

Adelfa B. CALLEJO et al., Intervenors-Appellants.

No. 75–2605.

United States Court of Appeals, Fifth Circuit.

May 9, 1977.

As Modified on Denial of Rehearing July 13, 1977.

Sylvia M. Demarest, Dallas, Tex., Dallas Legal Services Foundation, Inc., Edward B. Cloutman, III, James A. Johnston, Walter L. Irvin, Dallas, Tex., for plaintiffs-appellants.

George Solares, Frank P. Hernandez, Dallas, Tex., for A. B. Callejo et al.

N. Alex Bickley, City Atty., Lee E. Holt, Joseph G. Werner, Lois C. Bacon, Dallas, Tex., for defendants-appellees.

Before TUTTLE, GOLDBERG and CLARK, Circuit Judges.

TUTTLE, Circuit Judge:

In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court held that the constitutional validity of legislative apportionment schemes was a justiciable question because "[j]udicial standards under the Equal Protection Clause are well developed and familiar," 369 U.S. at 226, 82 S.Ct. at 715. Subsequent decisions establishing the principle of individual electoral equality, *see Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and applying the dilution doctrine, *see White v. Regester*, 412 U.S. 755, 93 S.Ct. 2342, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), have confirmed the Court's sanguine assessment of the judiciary's capacity to eliminate unfair treatment of voters as individuals and to enhance the prospects for effective political participation by formerly disenfranchised racial minorities. A necessary concomitant to the formulation of constitutional principles governing the legality of particular types of apportionment plans has been the develop-

ment of a federal common law of voting rights remedies. This appeal concerns such a remedy.

## I. DALLAS CITY COUNCIL ELECTIONS

Three major racial groups make up the population of Dallas, Texas. Sixty five percent of Dallas' citizens are white; twenty five percent are black; and ten percent are Mexican-American[1] or chicano. Prior to the 1975 elections, the Dallas City Council was selected in the following manner. The City was divided into eight residential districts; eight "places" on the council ballot were reserved for candidates who resided in each of the respective districts; three additional Council members, including the mayor, ran without regard to the residency requirement; but voting for all eleven seats was on an at-large basis. The result of the residency requirement plus at-large voting for all seats was that even though candidates carried black districts by huge majorities they were regularly defeated by opponents who carried the majority white vote city-wide.

Candidates for the Dallas City Council have traditionally been nonpartisan. No party primaries have ever been held, although a majority-vote requirement has necessitated run-off elections whenever a candidate for a particular "place" obtains only a plurality of the popular vote. Crucial to success in the Council elections has been the endorsement of the Citizens' Charter Association (CCA); approximately eighty percent of the candidates supported by this slating group have been victorious. Since 1969, the CCA has endorsed at least one minority group candidate for a City Council position in the biennial elections. At the time the case was tried by the district court, two blacks and one Mexican-American were serving on the eleven-person City Council. All three had been supported by the CCA. No black or chicano had ever won a Council seat without CCA backing; few whites had,

although Mayor Wise did win as an independent.

The district court has held that the at-large system of electing *all* Dallas City Council members unconstitutionally dilutes the voting strength of the black community of Dallas. *Lipscomb v. Wise*, 399 F.Supp. 782 (N.D.Tex.1975). Mexican-Americans have also been recognized as an identifiable racial group for purposes of the fourteenth amendment, *see e. g., Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). But the district court's judgment here appealed from did not attempt to determine the constitutionality of the Dallas elections system with respect to chicanos, because all Mexican-American plaintiffs had been dismissed from the lawsuit for failure to comply with discovery orders. 399 F.Supp. at 784. Thus, for purposes of this appeal only, we must assume that no constitutional violation of the rights of Mexican-American citizens occurred under the at-large scheme.

## II. PARAMETERS OF THE DISPUTE

The City of Dallas does not challenge the district court's holding that the all at-large system unconstitutionally diminishes the voting strength of Dallas' black citizens. The problem, instead is the selection of an appropriate remedy. The district court approved the City's plan for relief, which was enacted as a city ordinance following the court's decision that the prior system was unconstitutional. That plan, known as the "eight/three" plan, provides for the establishment of eight single-member districts corresponding to the eight residential districts under the all at-large system. The additional Council members are to be elected at-large, with one of the at-large seats being designated as mayor. The plaintiff-appellants contend that the district court's decision must be reversed because (1) it employs at-large voting to fill three Council seats; and (2) the district lines have allegedly been drawn so as to concentrate

1. We use interchangeably the term Mexican-American and Chicano to comprehend that group, largely of Spanish-surnamed citizens, mostly of Mexican origin. *See Hernandez v. Texas*, 347 U.S. 475, 480, 74 S.Ct. 667, 98 L.Ed. 866.

black voters in an impermissibly small number of districts, resulting in "cluster dilution." Representatives of the Mexican-American community, whom the district court permitted to intervene at the remedy stage of the lawsuit, also appeal and ask that we remand for findings concerning alleged unconstitutional dilution of the voting strength of Dallas' chicano citizens and for the development of an election plan that would remedy that alleged violation.

■ We note at the outset two limits on our decision here. First, if the election plan proposed and formally adopted by the City Council is (1) constitutional and (2) otherwise in accordance with the federal common law of voting rights remedies, it should be approved. *See Burns v. Richardson,* 384 U.S. 73, 85, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Wallace v. House,* 515 F.2d 619, 634–35 (5th Cir. 1975) (*Wallace I*), *vacated and remanded on other grounds,* 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976), *on remand* 538 F.2d 1138 (5th Cir. 1976) (*Wallace II*). Second, it is concededly impossible that an eleven-member plan of any sort could be drawn for the city of Dallas which would create a "safe" single-member district for the Mexican-American community unless some form of cumulative voting, proportional representation, or crazy-quilt district boundaries were employed. Mexican-American citizens are so dispersed throughout Dallas that a safe single-member chicano district could be established only by increasing the size of the Council to twenty or twenty-two members. The largest concentration of Mexican-Americans in the City's plan for eight single-member districts is twenty percent of one district's population. Under the two alternate plans proposed by the plaintiffs, no more than thirty one percent of any district's population would be chicano. The Mexican-American intervenors themselves offered no proposed plans. This Court, on the facts of this case, has no authority to order the City of Dallas to double the size of its City Council. Therefore, as far as the effects of reapportionment on the Mexican-American community are concerned, we are limited to the consideration of plans for an eleven-member Council.

## III. THE PREFERENCE FOR SINGLE-MEMBER DISTRICTS

■ We have previously recognized Dallas' longstanding public policy in favor of at-large voting. *See Zimmer v. McKeithen,* 485 F.2d 1297, 1307 (5th Cir. 1973) (en banc). It comes as no surprise, therefore, that the reapportionment plan proposed by the City is a "mixed" plan, containing eight single-member districts and three at-large seats. It cannot, however, be successfully maintained that the use of at-large voting to select three Council members is in itself constitutionally defective. *White v. Regester,* 412 U.S. 755, 765, 93 S.Ct. 2342, 37 L.Ed.2d 314 (1973) (multi-member districts are not *per se* unconstitutional); *Chapman v. Meier,* 420 U.S. 1, 15, 95 S.Ct. 751, 760, 42 L.Ed.2d 766 (1975) (Court "has upheld numerous state-initiated apportionment schemes using multi-member districts").

Appellants contend that the district court's approval of the City's proposed reapportionment plan must be reversed as an abuse of discretion. This contention is founded on the Supreme Court's recent decision in *East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam). In *East Carroll,* the district court had approved a municipal plan calling for the at-large election of all members of a parish police jury and school board. This Court reversed on constitutional grounds, holding that the all at-large system unconstitutionally diluted the voting power of black citizens. *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973) (en banc). The Supreme Court, however, expressly avoided disposition of the case on constitutional grounds. 424 U.S. at 639, 96 S.Ct. 1083. Rather, the Court affirmed our decision on the basis of

the rule that when United States district courts are put to the task of fashioning reapportionment plans to supplant concededly invalid state legislation, single-member districts are to be preferred absent unusual circumstances. . . . .

As the en banc opinion of the Court of Appeals amply demonstrates, no special circumstances here dictate the use of multimember districts. Thus we hold that in shaping remedial relief the District Court abused its discretion in not initially ordering a single-member reapportionment plan.

424 U.S. at 639–40, 96 S.Ct. at 1085; accord, *Paige v. Gray*, 538 F.2d 1108, 1111 (5th Cir. 1976); *Wallace v. House*, 538 F.2d 1138, 1142 (5th Cir. 1976)."

## IV. THE MEXICAN–AMERICAN AS CREATING A "SPECIAL CIRCUMSTANCE"

Here, the district court approved the City's eight/three plan on the following basis:

"I conclude that Mexican-American citizens do not suffer from present dilution of their voting strength, and in fact, benefit to a significant extent from at-large voting. . . . The Court finds that an exclusive single-member district plan would do nothing to increase the opportunity for Mexican-American participation in the political life of Dallas and might tend to decrease it. . . . [I]t is clear that at-large voting offers features which allow greater participation in the political processes within Dallas for Mexican-American voters [which] would be unavailable in an exclusive single-member district voting plan. . . . Mexican-American citizens will, under the eight/three plan, have a heretofore unavailable flexibility and greater opportunity to participate in the political life of Dallas."

399 F.Supp. at 793–94.

█ Although a group of Mexican-Americans were originally plaintiffs in the district court, they were dismissed for failure to comply with discovery. 399 F.Supp. at 784. A class consisting of Mexican-American voters were permitted to intervene at the remedy stage of the lawsuit, but the district court's finding of unconstitutionality concerned the voting strength of black citizens only. The intervenors presented no

plans for reapportionment at the remedy stage. Their position can be fairly characterized as being in favor of any reapportionment plan that would create a "safe" Mexican-American seat on the Dallas City Council. Of course, no racial group has a constitutional right to be represented in a legislative assembly by a member of the group. On the other hand, representation by a person of one's own race is the most visible sign that a racial group has effective access to the political process and that the assembly will hear those concerns that are peculiar to the group. It is generally concluded that no single-member district will be dominated by chicanos, who comprise only eight to ten percent of Dallas' population and whose residences are not geographically concentrated. The question on appeal is therefore whether the particular situation of Mexican-American citizens in Dallas constitutes a "special circumstance" within the contemplation of *East Carroll* and our opinion on remand in *Wallace v. House*. We think it does not.

The major difficulty with the district court's decision that a mixed plan would improve Mexican-American access to the political process is that there has never been a determination that their access has been unconstitutionally impaired. At the liability stage of the trial, there was no evidence presented concerning the voting rights of the dismissed chicano plaintiffs. At the remedy stage, the Mexican-American intervenors suggested that the voting power of chicanos had been diluted in the same fashion as the voting power of the black community. The City did not oppose these assertions. (Indeed, they furthered the City's position.) The trial court was ambivalent:

"The Court finds that Mexican-American citizens of Dallas have suffered some restrictions of access to the political processes within the city but that this restriction does not amount to dilution. 399 F.Supp. at 793.

I conclude that Mexican-American citizens do not suffer from present dilution of their voting strength, and in fact, ben-

efit to a significant extent from at-large voting.

399 F.Supp. at 793.

Mexican-Americans have entered to some extent into the political life of Dallas through the present at-large system. At-large voting may operate in part as a restriction of access for Mexican-Americans as it has been for blacks. At the same time however, it is clear that at-large voting offers features which allow greater participation in the political processes within Dallas for Mexican-American voters [which] would be unavailable in an exclusive single-member district voting plan."

399 F.Supp. at 794.

Thus, for purposes of this appeal, we must assume that the former all at-large system was not unconstitutional with respect to Dallas' chicano community. The problem that the chicano office seeker faces in Dallas is that only eight to ten percent of Dallas' citizens are Mexican-Americans. In any election contest dominated by racial or ethnic block voting, a Mexican-American will always come in third to the white candidate and the black candidate. Chicano politics in Dallas must be the politics of coalition.

Furthermore, we find most enlightening on this matter of the relative advantages of eight/three and eleven/zero systems to Mexican-Americans a pleading filed on their behalf pending this appeal. The trial court expressly retained jurisdiction of the case for possible future modifications. Shortly after the trial court judgment an election was held at which a member of the class was defeated for one of the at-large posts. Thereafter, counsel for the Mexican-American intervenors filed a motion with the trial court for a further hearing as to the correctness of the trial court's order approving the eight/three city council. In support of this motion, counsel made the following statements:

"Intervenors would show the Court that under the approved 8 3 plan Mexican-Americans are restricted in their access from entering into the political life of Dallas. It is clear that At Large voting does not offer features which allow greater participation in the political process within Dallas for Mexican-American voters, but in fact dilutes the vote of the Mexican-American citizen and makes it impossible for a Mexican-American to participate meaningfully in the election process.

Intervenors would show the Court that the results of the election of April 1, 1975, and other additional evidence will establish that Mexican-Americans are being denied representation and do suffer from the present dilution of their voting strength and do not benefit to a significant extent from At Large voting."

Thus, it will be seen that by pleadings filed by them, a class for whose benefit the trial court sought to act, has not only disclaimed the "benefit" but also denied the basis of which it rests.

■ We conclude that (1) as far as this record is concerned, chicano "access" to the political processes of Dallas need not be improved since it is *ex hypothesi* the same "access" as that of white persons; and (2) the district court's opinion was based on a theory of electoral politics that applies as well if not better to single-member districts than to at-large elections. Thus, the situation of the Mexican-American voters does not constitute a special circumstance within the contemplation of the cases which require that absent such special circumstances, the city's legislative body be elected from single members districts.

## V. ELECTION OF MAYOR

■ No showing has been made as to the city's preference for the election of a mayor[2] if the City is to operate with an eleven member council chosen by districts. Under the present plan, he is required to be

---

**2.** The mayor's office in Dallas is what is known as a "weak mayorality." That official merely presides over council meetings and represents the City. He has no legislative powers *qua* mayor. He has no veto powers. City government is administered by a City Manager.

the city-wide candidate for "position" No. 11 of one of the at-large posts. The City may provide for the election of the mayor by general city-wide election or by election by City Council.

## VI. CONCLUSION

Therefore, the order appealed from is reversed and remanded with instructions for the district court to require the City to reapportion itself into an appropriate number of single-member districts for the purpose of holding City Council elections. Should the City fail to propose an acceptable plan, the court shall formulate its own plan. The trial court shall also consider the appellant's claim here that he is entitled to attorney's fees for all services through the completion of this appeal. *See* 42 U.S.C.A. § 1988 (Supp.1977).

REVERSED AND REMANDED.