### Elmer JENKINS et al., Plaintiffs-Appellants,

v.

### CITY OF PENSACOLA et al., Defendants-Appellees.

#### No. 79-1633.

United States Court of Appeals, Fifth Circuit.

Feb. 19, 1981.

* Senior Circuit Judge of the Sixth Circuit, sitting by designation.

J. U. Blacksher, Mobile, Ala., for plaintiffs-appellants.

---

Don J. Caton, City Atty., Pensacola, Fla., for defendants-appellees.

Charles S. Rhyne, William S. Rhyne, Washington, D.C., for City of Pensacola, et al.

Before COLEMAN, PECK * and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

This appeal presents the very narrow but difficult question of whether the district court properly "approved"[1] a 7–3[2] plan for future City Council elections in Pensacola, Florida.[3]  We have today, in a separate opinion, *McMillan v. Escambia County,* 638 F.2d 1239 (5th Cir. 1981), affirmed the district court which held unconstitutional the at-large system for the election of City Council members.

The decision of whether to affirm or reverse in this, the remedy phase of the appeal,[4] is governed by a determination of whether the plan at issue is properly characterized as a "legislative" or "court-ordered" plan.  If it is classified as "legislative," then the district court properly deferred to the City Council and the plan is acceptable under *Wise v. Lipscomb,* 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978).  On the other hand, if the plan is "court-ordered," then the presence of the three at-large seats makes the plan unacceptable under *East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).[5]

---

* Senior Circuit Judge of the Sixth Circuit, sitting by designation.

1. We use the term "approved" reluctantly as the issue in the case is whether the district judge merely approved the plan or whether he ordered it implemented.

2. A 7–3 plan is one with seven single-member districts and three at-large districts. The single-member district council members would be required to reside within the district and would be elected by the voters of the district. There

would be no residency requirement for the at-large seats.

3. After final approval of the plan, the district court stayed his order pending resolution by this court of the city's appeal on the merits.

4. *See McMillan v. Escambia County,* 638 F.2d 1239, 1240 n.1 (5th Cir. 1981).

5. At-large seats are not, of course, *per se* unacceptable in a court-ordered plan.  However, in order to use at-large seats in a court-ordered

This dichotomy of result depending on the characterization of the plan was created by the Supreme Court's decision in *Wise v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978). At issue in *Wise* was the plan for electing the City Council in Dallas, Texas, which had been adopted after the former at-large system was declared unconstitutional.[6] The district court "afforded the city an opportunity as a legislative body for the City of Dallas to prepare a plan which would be constitutional." 437 U.S. at 538, 98 S.Ct. at 2496. The Dallas City Council took advantage of that opportunity and passed a resolution which stated that the Council intended to enact an ordinance which would create an 8–3 system. That proposal was submitted to the district court, which, after a hearing, announced the plan was constitutionally acceptable. The City Council then formally enacted the ordinance. Subsequently, the district court entered a written order approving the city plan as a valid legislative act. *Lipscomb v. Wise*, 399 F.Supp. 782 (N.D.Tex.1975).

The Fifth Circuit reversed, holding the plan should have been judged as a court-ordered plan. Under *East Carroll Parish*, the controlling law on court-ordered plans, the presence of the three at-large seats rendered the plan unacceptable. *Lipscomb v. Wise*, 551 F.2d 1043 (5th Cir. 1977).

The Supreme Court reversed this court, holding that the 8–3 plan was, in fact, a legislative plan and thus the presence of at-large seats did not render it unacceptable. The decision in *Wise* did not, however, delineate a bright line test to facilitate lower courts in characterizing plans as either legislative or court-ordered. There were four opinions announced in *Wise*, though only three are relevant here.[7] Mr. Justice White authored the plurality opinion in which only Justice Stewart joined. Justice Powell, joined by Justices Burger, Blackmun and Rehnquist, joined in the judgment, and filed a separate opinion. Justices Marshall, Brennan and Stevens dissented.

In *Marshall v. Edwards*, 582 F.2d 927, 932–33 (5th Cir. 1978),[8] Judge Wisdom reviewed *Wise* and extracted the major points under each of the separate opinions. According to Judge Wisdom, Justice White saw three important differences between the plan in *Wise* (legislative) and the plan in *East Carroll Parish* (court-ordered).

In *Wise* the district court reviewed the plan as a legislative plan. In [*East Carroll Parish*], by contrast, the local bodies submitted plans in response to court orders and "did not purport to reapportion themselves . . . ." 437 U.S. at 545, 98 S.Ct. at 2495. Second, in [*East Carroll Parish*] federal law prevented the bodies from effectively redistricting. The state law providing police juries and school boards with that power had been disapproved by the Attorney General under § 5 of the Voting Rights Act. [*East Carroll Parish*], 424 U.S. at 638 n. 6, 96

---

plan, "special circumstances" must be present. *Corder v. Kirksey*, 585 F.2d 708, 713–14 (5th Cir. 1978).

**6.** In contrast to the situation in the case at bar, the Dallas City Council did not appeal the merits decision, i. e., it did not contest the finding of dilution.

**7.** Justice Rehnquist wrote an opinion, joined in by Justices Burger, Stewart and Powell, making it clear the Court in *Wise* had not been presented with the question of whether the district court was correct in holding the Dallas form of government unconstitutionally diluted the voting strength of black citizens. 437 U.S. at 549–50, 98 S.Ct. at 2501–02.

**8.** The *Marshall* case is a continuation of the *East Carroll Parish* case. That case began in 1968 when Charles Zimmer sued various officials of Louisiana and East Carroll Parish alleging that the apportionment of the police jury and school board was unconstitutional. In response to that suit, the district court adopted a parish at-large system. A panel of this court affirmed, *Zimmer v. McKeithen*, 467 F.2d 1381 (5th Cir. 1972), but was reversed by the en banc court, 485 F.2d 1297 (5th Cir. 1973). The case was appealed to the Supreme Court which affirmed the en banc court, but did so on the ground that exceptional circumstances must be present to justify a district court in ordering at-large elections. *East Carroll Parish School Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). On remand, the district court adopted a new plan. That order was appealed and reversed in *Marshall v. Edwards*, 582 F.2d 927 (5th Cir. 1978).

S.Ct. 1083. Finally, in *Wise* the court explicitly gave the Council an opportunity to pass constitutional apportionment, which it did.

582 F.2d at 932.

Justice Powell's opinion, on the other hand, focused not on whether the Council had the *power* to reapportion itself (a subject discussed at length in Justice White's opinion), but on whether it was acting as a legislative body when it developed or approved the plan.

Justice Marshall's dissent saw no meaningful distinction between *East Carroll Parish* and *Wise*. In Marshall's view, the fact that the *Wise* defendants did not follow state procedures [9] and did not purport to enact binding redistricting was dispositive of the issue—the plan was court-ordered.

In the fact situation of *Marshall v. Edwards*, 582 F.2d 927 (5th Cir. 1978), it was relatively easy to conjoin the opinions of Justices White and Powell to decide the plan at issue was court-ordered; all of Justice White's considerations pointed to that conclusion. 582 F.2d at 933. Furthermore, Justice Powell had distinguished *East Carroll Parish* from *Wise* based on the fact that under § 5 of the Voting Rights Act, the state statute empowering the East Carroll Parish police jury to reapportion itself was illegal, whereas Dallas was not covered under § 5 of the Voting Rights Act. Also, *Marshall* involved the East Carroll Parish police jury, which according to Powell's opinion in *Wise*, was not acting as a legislative body in the development of a reapportionment plan.

While the facts in *Marshall* pointed directly to the conclusion that the plan was court-ordered, such is not the case here.

Considerations militate in both directions: some tilt toward legislative; others indicate the plan is court-ordered. On balance, however, we feel it is better viewed as a legislative plan.

Factually, the scenario here generally tracks that of *Wise*. After he declared unconstitutional the at-large system used in Pensacola to elect the City Council, Judge Arnow ordered the parties to "submit proposals that they believe provide an effective remedy for the dilution found by the court to exist." Both parties filed suggested plans. The plaintiffs' plan was for ten single-member districts, while the defendants submitted a 7–3 plan.

A hearing was then held on the propriety of the defendants' plan. Judge Arnow issued a written order on December 27, 1978, approving the plan as a legislative plan. He noted that the city's plan could go into effect without the necessity of a referendum, under the "thrust" of *Wise v. Lipscomb*.[10] The court then wrote:

> The Court hereby directs the Defendant City of Pensacola, to take all necessary and proper steps to formally implement the plan submitted to the Court in its regular course of business and to submit this plan back to the Court after taking all such necessary steps. The Court will enter its Final Order approving the plan at that time.

Approximately three weeks later, the city submitted its final plan which had been formally adopted by Ordinance No. 3–79, the final reading of which had occurred on January 11, 1979. Section 3 of Ordinance No. 3–79 provided:

> stayed, Pensacola would have had elections under the new plan without submitting it to a referendum vote.

**9.** Dallas was a home rule city. Under the terms of its charter, however, in order to reapportion itself, it was required to conduct a popular referendum. 437 U.S. at 552, 98 S.Ct. at 2503. Despite that requirement, Dallas reapportioned itself and had elections before submitting the new plan to a referendum vote. Pensacola is also a home rule city, Fla.Const. art. 8, § 2, and must also submit any changes in the charter to a referendum vote of the people, Fla.Stat.Ann. § 166.02–166.12. Like Dallas, had the order of the district court not been

**10.** The argument, as advanced by Justice White in *Wise*, is that once the charter provision setting up the at-large election system is declared unconstitutional, the Council is free to exercise its apparently inherent legislative powers to enact a new system. 437 U.S. at 544, 98 S.Ct. at 2499.

This ordinance and the election plan set forth herein shall become effective at the next regular or special election of the City Council *as ordered by the District Court* unless the order of said District Court is modified, reversed or stayed, in which event the election of members of the City Council shall proceed in a manner provided by the said Federal Court. (Emphasis added).

The district court then entered an order approving the final redistricting plan as contained in the ordinance. That day, the defendants applied for a stay pending appeal. Their application for the stay and supporting memorandum requested either (1) a stay of the order which found the system unconstitutional and a stay of the December 27, 1978, order which initially approved the 7–3 plan,[11] or (2) a stay of all elections pending final action by the Fifth Circuit.

The application for a stay order was opposed by the plaintiffs, but they stated that if Judge Arnow was disposed to grant a stay they would prefer for him to allow the scheduled May at-large elections to proceed. Judge Arnow did just that: he stayed implementation of his order declaring the system unconstitutional and his order which approved the 7–3 city plan. The May 1979 elections proceeded on schedule.

Based upon the three factors articulated by Judge Wisdom to be determinative under Justice White's *Wise* opinion, this plan appears to be legislative. As in *Wise*, the district court here reviewed the plan as a legislative plan; federal law did not prevent the City Council from redistricting itself; and the court told the City Council to reapportion itself. 582 F.2d at 932. Furthermore, the factor which Justice Powell found distinguished *Wise* from *East Carroll Parish* also distinguishes this plan from that in *East Carroll Parish* : Pensacola, like Dallas, is not covered under § 5 of the Voting Rights Act.

Notwithstanding the fact that this case seems to fall within the *Wise* rule, the plaintiffs argue the plan is court-ordered. Their argument is: (1) by its language in Ordinance No. 3–79, the Council delegated to the district court the responsibility of determining if and when the plan would become effective; and (2) the plan was not submitted to the electorate for ratification. We find neither argument carries the day.

The plaintiffs make much of the fact that under the wording of the ordinance, the City Council was not purporting to take responsibility for the plan, but was delegating that responsibility to the federal court. According to the plaintiffs, the key to making the legislative/court-ordered distinction should be who takes responsibility for the plan.

It would appear, however, that the Dallas City Council did not take much more responsibility for its plan than Pensacola did. The Dallas Council did not enact a binding ordinance until after the district court indicated it would approve the plan. 437 U.S. at 553, 98 S.Ct. at 2503–04 (Marshall, J., dissenting). The plaintiffs are correct that the Pensacola City Council took even less responsibility. According to its ordinance, the plan would never take effect unless so ordered by the district court. Still, Pensacola took more responsibility for the plan than did the defendants in *Marshall*, where the plan was held to be court-ordered. There, the attorney for the defendants made it clear that all the Police Jury did was agree to submit the plan to the court. 582 F.2d at 933. The actions of the Pensacola City Council fall between those in *Marshall* and *Wise* but seem closer to *Wise* and hence to legislative action.

Though the plaintiffs argue the City Council was delegating its authority to the district court, it would appear that the district court did not accept the responsibility but placed it back into the lap of the City Council. For example, despite the wording of Ordinance No. 3–79, the district court's order simply approved the ordinance; it did not order it into effect. Thus, while the

---

**11.** This would have permitted at-large elections, scheduled for May 1979 to proceed.

City Council's language in section 3 may[12] have contemplated an order putting it into effect, the district court did not respond with such an order.[13]

Plaintiffs' second argument against this being a legislative plan is that Pensacola did not go through the referendum process as is required under its Home Rule Charter. They see some significance in the fact that in *Wise* the Dallas City Council eventually submitted the 8–3 plan to the electorate, although admittedly it was after the plan had already been put into effect. 437 U.S. at 539 n. 3, 98 S.Ct. at 2496 n. 3.

We do not read *Wise* to make the eventual referendum essential to its ruling. Justice White's opinion indicates that once the at-large provision in the City Charter was declared unconstitutional, the city was free to exercise apparently inherent legislative powers to enact a new system, 437 U.S. at 544, 98 S.Ct. at 2499, without the necessity of following the set procedure which requires a referendum. We are persuaded that the same reasoning should apply here.

Deciding whether this plan is legislative or court-ordered admittedly is difficult. However, the Supreme Court clearly indicated in *Wise* that federal courts should only reapportion local governments when

those with legislative responsibilities do not respond to the need. 437 U.S. at 540, 98 S.Ct. at 2497. We cannot say Pensacola's actions were so unresponsive to the need for reapportionment that the federal court should have enacted a court-ordered plan.

The plaintiffs further argue that even if this is a legislative plan, it is not constitutional. In *Wise*, the Supreme Court, over a three-Justice dissent on the point, upheld the 8–3 plan proposed for Dallas. That plan would have virtually "guaranteed"[14] that two of the eight single-member district City Council seats would be occupied by blacks. 399 F.Supp. at 795. At that time, Dallas was 65% white, 25% black and 10% Hispanic. *Lipscomb v. Wise*, 551 F.2d 1043, 1045 (5th Cir. 1977). Thus, one-quarter of the population was being "guaranteed" one-quarter of the single-member seats, but only 18% of all seats.[15] The plan was almost a perfect one person-one vote apportionment. *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).[16]

In *Calderon v. McGee*, 584 F.2d 66 (5th Cir. 1978), *modified on rehearing*, 589 F.2d 909 (1979), this court approved a 5–2 plan for the Waco Independent School District (WISD). The minority[17] population of WISD was approximately 28%. As the district lines were drawn, the minority popula-

---

**12.** The language of § 3 is actually ambiguous. It can be read to mean the ordinance will go into effect, but whether it will take effect at the next regular election or whether there is to be a special election where it will take effect is up to the district court.

**13.** The plaintiffs also assert that this case is distinguishable from *Wise* because in *Wise* Dallas proceeded with elections under the new plan while their appeal was pending whereas Pensacola did not. Initially, we would note that the fact that Dallas proceeded with elections while the appeal was pending has not been seen as central to the *Wise* ruling. *See Calderon v. McGee*, 584 F.2d 66, 69 (5th Cir. 1978), *modified on rehearing*, 589 F.2d 909 (5th Cir. 1979).

That is not to say that the stay granted by the district court is irrelevant to our determination of whether this plan is legislative or court-ordered. There is a certain amount of surface appeal to the assertion that a stay only makes sense if the plan is court-ordered. However, a careful reading of the stay reveals that it does not stay the plan, but rather stays the district

court's decision on the merits and its approval of the plan.

**14.** Clearly nothing is "guaranteed" when dealing with people's voting behavior. In vote dilution cases, however, given a history of racially polarized voting, a seat is considered to be a "guaranteed" minority position if over 50% of the citizens eligible to vote in the district are members of the given minority.

**15.** That statistic assumes the minority population is unable to elect an at-large council member. Of course, the presence of three at-large seats does give the minority population a voice in three representatives in addition to the two who come from districts populated by minorities.

**16.** The district with the largest population had 105,759 people whereas the least populated district had 105,353 people. 399 F.Supp. at 795.

**17.** Blacks comprised 19.4% of the population and Mexican-Americans comprised 8.7%.

tion could control two of the five single-member district seats. Thus, a 28% minority could elect 28% of the entire school board, and could elect 40% of the single-member district seats. The court did not discuss the extent of deviation from the one person-one vote ideal expressed in *Reynolds*.

The plan approved in this case would permit black Pensacolans to elect three of the seven single-member district seats. Thus, a 33% minority could elect almost one-third of all council seats, and 43% of the single-member district seats. The plan deviates by 14% from the one person-one vote ideal.

The plaintiffs argue that because there has been a finding of vote dilution, the ideal reapportionment is one which will create "enough majority black single-member districts to give blacks the opportunity to elect representatives in proportion to their population percentage." They then argue that the "ideal reapportionment" is ten single-member districts. With that we cannot agree.

As drawn the plan will permit blacks to elect a proportionate number of council members. That conforms to the ideal and thus will not be disturbed by this court.[18]

The 14% deviation from the one person-one vote ideal should be dealt with briefly.[19] The district court found the deviation to be acceptable because to reduce it in the context of a 7–3 plan would require undue distortion of precinct lines and contiguity. Given the fact that this is a legislative plan, *see Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), and that the council will have to be reapportioned after the 1980 decennial census, we cannot say the 14% deviation renders the plan unconstitutional.

The district court is AFFIRMED and the stay of all elections granted by this court on March 10, 1980 is hereby DISSOLVED.

---

18. At the heart of the plaintiffs' complaint is a fear that the plan, which permits a 33% minority to elect 43% of the single-member district seats, is incapable of repetition. We agree that it may be difficult to repeat. However, we cannot invalidate an otherwise acceptable plan because of what might be a problem in the future. Furthermore, Judge Arnow has placed Pensacola under § 3 of the Voting Rights Act for a period of five years unless it is shortened or extended by the court. Thus, the district court has supervisory control over future reapportionments and can assure that, at least for five years, the apportionment will be done so as to give the minority population a fair number of representatives.

19. Neither party, however, contends the 14% deviation is too great.