Barney QUILTER, et al., Plaintiffs,

v.

George V. VOINOVICH,
et al., Defendants.

No. 5:91 CV 2219.

United States District Court,
N.D. Ohio,
Eastern Division.

March 31, 1994.

Timothy F. Scanlon, Scanlon & Gearinger, Akron, OH, Armistead W. Gilliam, Jr., Ann Wightman, Faruki, Gilliam & Ireland, Dayton, OH, for plaintiffs Barney Quilter, Thomas E. Ferguson, Glen Achtermann, Sam Barone, Sandra Guy, Robert McLaughlin, James B. McCarthy, Gladys Henson, Tom Kilbane, Robert H. Trainer, A. Wayne Bussler, James P. Speros, Kenneth Thorne, Charles Walker, William Shanklin, Clarence Lumpkin, Tyrone Riley.

Timothy F. Scanlon, Scanlon & Gearinger, Akron, OH, Thomas I. Atkins, Sr., Brooklyn, NY, Armistead W. Gilliam, Jr., Ann Wightman, Laura A. Sanom, Faruki, Gilliam & Ireland, Dayton, OH, for plaintiff William L. Mallory.

Orla Ellis Collier, III, Norton Victor Goodman, James F. DeLeone, Mark D. Tucker, Benesch, Friedlander, Coplan & Aronoff, Columbus, OH, Charles M. Rosenberg, Maynard A. Buck, III, Jeremy Gilman, Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH, for defendants George V. Voinovich, Stanley J. Aronoff, Robert A. Taft, II.

Charles M. Rosenberg, Maynard A. Buck, III, Jeremy Gilman, Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH, for defendant James R. Tilling.

Jack Gregg Haught, Andrew S. Bergman, Office of Atty. Gen., Columbus, OH, for real party in interest State of OH.

Lawrence A. Kane, Jr., Dinsmore & Shohl, Cincinnati, OH, special master.

Armistead W. Gilliam, Jr., Ann Wightman, Faruki, Gilliam & Ireland, Dayton, OH, for intervenors-plaintiffs Paul Mechling, Mary Abel, Ronald Gerberry, Richard Cordray.

*OPINION AND ORDER*

Before: JONES, Circuit Judge, CELEBREZZE, Senior Circuit Judge, and DOWD, District Judge.

NATHANIEL R. JONES, Circuit Judge.

The plaintiffs filed this action to challenge the apportionment of Ohio's state legislative districts performed pursuant to 1990 census data. In *Voinovich v. Quilter*, —— U.S. ——, ——, 113 S.Ct. 1149, 1159, 122 L.Ed.2d 500 (1993), the United States Supreme Court determined that the plaintiffs had established a *prima facie* case that the population disparity among districts violates the Equal Protection Clause of the Fourteenth Amendment. The Court remanded the case to this court, instructing it to determine whether the disparity is justified. After consideration of this issue, we find that the population variations are justified under established constitutional standards.

## I

Pursuant to the Constitution of the State of Ohio, state house districts and state senate districts are drawn by a board of five individuals every ten years.[1] Such a five-member board was established following the 1990 federal census. The majority of the apportionment board[2] appointed Defendant James R. Tilling to draft an apportionment plan on their behalf. After Tilling submitted his plan, the board made various amendments to it, and the plaintiffs in this case challenged the plan that eventually was adopted. On February 18, 1992, in response to the Plain-

1. Article XI, § 1 of the Constitution of the State of Ohio provides:

> The governor, auditor of state, secretary of state, one person chosen by the speaker of the house of representatives and the leader in the senate of the political party of which the speaker is a member, and one person chosen by the legislative leaders in the two houses of the major political party of which the speaker is not a member shall be the persons responsible for the apportionment of this state for members of the general assembly.
>
> Such persons, or a majority of their number, shall meet and establish in the manner prescribed in this Article the boundaries for each

of ninety-nine house of representatives districts and thirty-three senate districts. Such meeting shall convene on a date designated by the governor between August 1 and October 1 in the year [1971] and every tenth year thereafter....

2. The majority consisted of George V. Voinovich, Governor of the State of Ohio; Stanley J. Aronoff, President of the Ohio Senate; and Robert A. Taft, II, Secretary of State of Ohio. In the minority were Barney Quilter, Speaker Pro Tempore of the Ohio House of Representatives, and Thomas E. Ferguson, Auditor of the State of Ohio.

tiffs' constitutional attacks upon the plan, the board made its last changes, resulting in what has been denominated "Amendment D." The plaintiffs maintained their challenge to Amendment D, claiming, *inter alia*, that the populations of some of the districts depart too greatly from the ideal size.

## A. The House Districts at Issue

After the 1990 census, the ideal Ohio house district included 109,567 individuals.[3] Amendment D designates as house districts seven counties whose population fall within ± 10% of the ideal house district size. The populations of four of these counties fall between 95% and 105% of the ideal.[4] The populations of the three others fell between 90%–95% or 105%–110% of the ideal: House District 5 (Ashtabula County—population 99,821, or 91.10% of the ideal district size); House District 6 (Fairfield County—population 103,461, or 94.43% of the ideal district size); and House District 7 (Wayne County—population 101,461, or 92.60% of the ideal district size).

Under Amendment D, the largest district (House District 20—a portion of Cuyahoga County) has a population of 114,943, or 104.91% of the ideal district size. As the majori-

ty plan stands then, the total deviation[5] between the most populous and least populous state house districts is ***13.81%*** (or the 104.91% of House District 20 minus the 91.10% of House District 5).

## B. The Senate Districts at Issue

After the 1990 census, the ideal Ohio senate district included 328,700 individuals.[6] Pursuant to Article XI, Section 11 of the Constitution of the State of Ohio, "[s]enate districts shall be composed of three contiguous house of representatives districts." Under Amendment D, the smallest senate district is Senate District 32—composed of House District 66 (the southwestern quadrant of Trumbull County), House District 67 (the southeastern quadrant of Trumbull County), and House District 68 (Geauga County and the northern half of Trumbull County). Senate District 32 has a population of 308,942, or 93.99% of the ideal district size. The largest is Senate District 1—composed of House District 82 (Williams, Fulton and Defiance Counties), House District 83 (Henry, Paulding, Putnam, and Van Wert Counties), and House District 86 (Hancock and Hardin Counties, and the northeastern quadrant of Auglaize County). Senate District 1

3. *See* Ohio Const. art XI, § 2:
   The apportionment of this state for members of the general assembly shall be made in the following manner: The whole population of the state, as determined by the federal decennial census or, if such is unavailable, such other basis as the general assembly may direct, shall be divided by the number "ninety-nine" and the quotient shall be the ratio of representation in the house of representatives for ten years next succeeding such apportionment....
   According to the 1990 census, Ohio's population was determined to be 10,847,115.

4. The four counties whose populations fell between 95% and 105% of the ideal district size are: House District 1 (Allen County—population 109,755, or 100.17% of the ideal district size); House District 2 (Warren County—population 113,909, or 103.96% of the ideal district size); House District 3 (Columbiana County—population 108,276, or 98.82% of the ideal district size); and House District 4 (Wood County—population 113,269, or 103.38% of the ideal district size).

5. As we described *Quilter v. Voinovich*, No. 5:91 CV 2219, 1992 WL 677145 (N.D.Ohio Mar. 19, 1992) at n. 11:
   Total deviation is arrived at by adding the percentage above the ideal district population

of the most overpopulated district to the percentage below the ideal district population of the most underpopulated district. Thus, a districting criterion that allows a *deviation* of plus or minus 5% would, generally speaking, yield a *total deviation* of 10%. *See, e.g.,* Connor v. Finch, 431 U.S. 407, 416–17 [97 S.Ct. 1828, 1835, 52 L.Ed.2d 465] (1977) (finding that 8.2% above the norm and 8.3% below the norm yields a total deviation, or "maximum deviation," of 16.5%).
   (Emphasis in original.)
   An alternative means of making the same calculation, used in the text, is to express the districts' relationship to the ideal district in percentage terms and then subtract the lowest percentage value from the highest one.

6. *See* Ohio Const. art XI, § 2:
   ... The whole population of the state as determined by the federal decennial census or, if such is unavailable, such other basis as the general assembly may direct, shall be divided by the number "thirty-three" and the quotient shall be the ratio of representation in the senate for ten years next succeeding such apportionment.

has a population of 343,582 individuals, or 104.53% of the ideal district size. Thus, the total deviation for the senate districts is *10.-54%* (or 104.53% minus 93.99%).

### C.  The Court's Remand

In an unpublished order filed March 19, 1992, we held that the plan's population disparities violated the equal population principles of the United States Constitution. In its opinion, the Supreme Court, *inter alia*, reversed this judgment and held that the plaintiffs had merely stated a *prima facie* case of vote dilution and that the apportionment plan's creators must be given an opportunity to explain whether the deviations are justified. —— U.S. at ——, 113 S.Ct. at 1159. Specifically, the Court instructed that we consider whether the deviations from the ideal district size are justified using the analysis employed in *Brown v. Thomson,* 462 U.S. 835, 843–46, 103 S.Ct. 2690, 2696–98, 77 L.Ed.2d 214 (1983), and *Mahan v. Howell,* 410 U.S. 315, 325–330, 93 S.Ct. 979, 985–87, 35 L.Ed.2d 320 (1973). —— U.S. at ——, 113 S.Ct. at 1159. In the following sections, we fully consider the defendants' justification under *Brown, Mahan,* and the Court's other relevant precedents.

### II

The Supreme Court's decision in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), established the principle that the Equal Protection Clause prevents the dilution of votes that can occur when citizens are placed in overpopulated state legislative districts.

> We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion

diluted when compared with votes of citizens living in other parts of the State.

*Id.* at 568, 84 S.Ct. at 1385.[7]

■ We are to give states "[s]omewhat more flexibility" in their establishment of state legislative districts as opposed to federal congressional districts. *Reynolds,* 377 U.S. at 578, 84 S.Ct. at 1390; *see also Brown,* 462 U.S. at 850 n. 2, 103 S.Ct. at 2693 n. 2 (O'Connor, J., concurring) ("The Court has recognized that States enjoy a somewhat greater degree of latitude as to population disparities in a state legislative scheme, which is tested under Equal Protection Clause standards, than in a congressional redistricting scheme, for which the Court has held that Art. I, § 2, of the Constitution provides the governing standard."); *Mahan,* 410 U.S. at 321–22, 327, 93 S.Ct. at 984, 986. The Court has given instructions as to the nature and extent of this flexibility in *Mahan, Brown,* and its other cases in this area.

■ Whether a *prima facie* case of a Fourteenth Amendment violation is established depends principally upon the amount of total deviation. Deviations from mathematical equality among state legislative districts are to be considered *de minimis* if the total deviation is between 0% and 10%. Where the deviation is *de minimis,* a plaintiff cannot establish a *prima facie* case of discrimination under the Equal Protection Clause. *Brown,* 462 U.S. at 842–43, 103 S.Ct. at 2696; *Connor v. Finch,* 431 U.S. 407, 418, 97 S.Ct. 1828, 1835, 52 L.Ed.2d 465 (1977); *see generally White v. Regester,* 412 U.S. 755, 763–64, 93 S.Ct. 2332, 2338, 37 L.Ed.2d 314 (1973) (state needed to provide no explanation for 9.9% total deviation); *Gaffney v. Cummings,* 412 U.S. 735, 750, 93 S.Ct. 2321, 2330, 37 L.Ed.2d 298 (1973) (state needed to provide no explanation for 7.83% total deviation); *Abate v. Mundt,* 403 U.S. 182, 184–87, 91 S.Ct. 1904, 1905–08, 29 L.Ed.2d 399 (1971) (county explanation required to uphold 11.9% total deviation).

---

7. At the time *Reynolds* was decided, the Court had already held that Article I, Section 2 of the Constitution requires that congressional districts be subject to an equal population standard. *See Wesberry v. Sanders,* 376 U.S. 1, 6, 84 S.Ct. 526, 529, 11 L.Ed.2d 481 (1964). *Reynolds* and *Wesberry* both implemented the Court's seminal decision in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), which held that districting disputes are justiciable.

If, as in the instant case, the total deviations exceed 10%, a *prima facie* case of a violation is established and the state is called upon to justify the deviations. Its justification must consist of three components: (1) articulating a "rational state policy" which may justify the deviations; (2) explaining how the apportionment plan "may reasonably be said to advance" the rational state policy; and (3) showing that the deviations resulting from the reasonable pursuit of the rational state policy do not "exceed constitutional limits." *Mahan,* 410 U.S. at 328, 93 S.Ct. at 987; *see also Brown,* 462 U.S. at 843, 103 S.Ct. at 2696.

### III

We now consider the components of the justification advanced to explain the population disparity here.

#### A. *Whether Defendants have asserted a rational state policy.*

The Supreme Court has considered certain purported rational policies to be unacceptable:

> [N]either history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes. Considerations of area alone provide an insufficient justification for deviations from the equal-population principle. Again, people, not land or trees or pastures, vote. Modern developments and improvements in transportation and communications make rather hollow ... most claims that deviations from population-based representation can validly be based solely on geographical considerations. Arguments for allowing such deviations in order to insure effective representation for sparsely settled areas and to prevent legislative districts from becoming so large that the availability of access of citizens to their representatives is impaired are today, for the most part, unconvincing.

*Reynolds,* 377 U.S. at 579–80, 84 S.Ct. at 1391. On the other hand, thus far the Court's foremost example of a rational state policy is the preservation of political subdivisions within a state. *See, e.g., Brown,* 462 U.S. at 842–43, 103 S.Ct. at 2696; *Mahan,* 410 U.S. at 329, 93 S.Ct. at 987 ("The policy of maintaining the integrity of political subdivision lines in the process of reapportioning a state legislature, the policy consistently advanced by Virginia as a justification for disparities in population among districts that elect members to the House of Delegates, is a rational one."); *Reynolds,* 377 U.S. at 580, 84 S.Ct. at 1391 ("A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions.").

The defendants seek to justify the total deviations in excess of 10% by asserting the rational state policy of preserving county lines, even with respect to those whole-county house districts whose populations depart by more than 5% from the ideal house district size. As described above, the Court expressly has found such a policy to justify deviations from population equality among state legislative districts.

Furthermore, it also appears that the asserted rational state policy has not been advanced disingenuously. The people of the State of Ohio have enacted constitutional provisions reflecting the proffered policy:

**XI § 3  House of representatives districts**

The population of each house of representatives district shall be substantially equal to the ratio of representation in the house of representatives, as provided in section 2 of this Article, and in no event shall any house of representatives district contain a population of less than ninety-five per cent nor more than one hundred five per cent of the ratio of representation in the house of representatives, except in those instances where reasonable effort is made to avoid dividing a county in accordance with section 9 of this Article.

. . . .

**XI § 9  Whole county as district**

In those instances where the population of a county is not less than ninety per cent

nor more than one hundred ten per cent of the ratio of representation in the house of representatives, reasonable effort shall be made to create a house of representatives district consisting of the whole county.

Ohio Const. art. XI, §§ 3, 9; *see also* Ohio Const. art. XI, § 10(B) ("Each county containing population between ninety and ninety-five per cent of the ratio or between one hundred five and one hundred ten per cent of the ratio may be designated a representative district."). The state constitution also manifests a policy of respecting county lines in the formation of senate districts:

### XI § 11 Formation of senate district

... A county having at least one whole senate ratio of representation shall have as many senate districts wholly within the boundaries of the county as it has whole senate ratios of representation. Any fraction of the population in excess of a whole ratio shall be a part of only one adjoining senate district. Counties having less than one senate ratio of representation, but at least one house of representatives ratio of representation shall be part of only one senate district.

Ohio Const. art. XI, § 11.

Ohio's clearly stated policy distinguishes this case from *Chapman v. Meier*, in which the Court rejected North Dakota's political boundary explanation for its plan's deviations. 420 U.S. 1, 25, 95 S.Ct. 751, 765, 42 L.Ed.2d 766 (1975) ("It is far from apparent that North Dakota policy currently requires or favors strict adherence to political lines.").

We find that the justification the Defendants advance for the total deviations in excess of 10% is appropriate for Equal Protection purposes, and has not been advanced without basis, for there is a state constitutional policy favoring the preservation of county lines when establishing state legislative districts.

### B. Whether the plan reasonably advances the policy.

The next question is whether Amendment D may reasonably be said to advance this rational state policy. The house districts were formed by following the procedures outlined in the state constitution:

### XI § 10 Creation and numbering of house of representatives districts

The standards prescribed in sections 3, 7, 8, and 9 of this Article shall govern the establishment of house of representatives districts, which shall be created and numbered in the following order to the extent that such order is consistent with the foregoing standards:

(A) Each county containing population substantially equal to one ratio of representation in the house of representatives, as provided in section 2 of this Article, but in no event less than ninety-five per cent of the ratio nor more than one hundred five per cent of the ratio *shall* be designated a representative district.

(B) Each county containing population between ninety and ninety-five per cent of the ratio or between one hundred five and one hundred ten per cent of the ratio *may* be designated a representative district.

Ohio Const. art. XI, § 10 (emphasis added).

Subsection 10(A) thus mandates the creation of whole county house districts where the counties fall within ± 5% of the ideal size; such counties could not in themselves create a total deviation above 10%. Subsection 10(B) permits the apportionment board to create districts out of counties within an additional 5% of the ideal size. We believe that providing this amount of additional latitude for house districts, but no more, is a reasonable manner in which the state may advance its policy.

The Ohio Constitution contains no equivalent provision that permits the creation of senate districts that deviate by more than 5% from the ideal. However, in the state court companion to this lawsuit, the Ohio Supreme Court directly upheld the creation of Senate District 32, the only district outside the permissible range. *Voinovich v. Ferguson*, 63 Ohio St.3d 198, 586 N.E.2d 1020 (1992). This decision interprets the constitution to permit the apportionment board to place the constitutional prohibition against dividing counties above the requirement that district popula-

tions fall within 5% of the ideal. The Ohio court explained that:

> leaving Senate District 32 underpopulated was unavoidable because irreconcilable conflicts with [the constitutional sections prohibiting the division of counties between senate districts] prevented adding population from adjacent territory.... When such provisions are irreconcilable, those public officials designated to apportion the state by Section 1 of Article XI have the duty to choose the proper course, and this court will not order them to correct one constitutional violation by committing another.

*Id.* 586 N.E.2d at 1022. Since Ohio's highest court has found the district's population deviation authorized by the state constitution, we accept that determination. *Brown v. Ohio,* 432 U.S. 161, 167, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187 (1977). At least where a district so created deviates by no more than 10% from the ideal, this interpretation of the Ohio Constitution reveals a manner of advancing the state policy that is just as reasonable as the expanded population range that Article XI, Section 10 explicitly provides for whole-county house districts.

Despite our conclusion that Ohio's constitution reasonably advances the policy, we must further delve into the implementation of the discretion that the constitution gives the apportionment board. Plaintiffs argue that this *particular* plan inconsistently or arbitrarily advances the policy, and we must not casually dismiss this assertion. *See Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964) (rational factors applied in a manner "free from any taint of arbitrariness or discrimination"); *Brown,* 462 U.S. at 847, 103 S.Ct. at 2698–99; *Mahan,* 410 U.S. at 325, 93 S.Ct. at 985. One way that plaintiffs may show arbitrariness is to prove that a plan could be produced that advances the policy just as well, but which creates a smaller total deviation. This is why the Court rejected Mississippi's county-line justification in *Connor v. Finch,* 431 U.S. at 420, 97 S.Ct. at 1836 ("[T]he plaintiffs in this case submitted to the District Court an alternative Senate plan that served the state policy against fragmenting

county boundaries better than did the plan the court ultimately adopted and also came closer to achieving districts that are as nearly of equal population as is practicable.") (quotation omitted). In cases that reject districting plans, the Court has typically made reference to an alternative plan to show that the contested plan did not achieve the state's stated policy. *See Swann v. Adams,* 385 U.S. 440, 445, 87 S.Ct. 569, 572, 17 L.Ed.2d 501 (1967) ("Florida could have come much closer to providing districts of equal population that it did" and still advanced its policy); *Kilgarlin v. Hill,* 386 U.S. 120, 124, 87 S.Ct. 820, 823, 17 L.Ed.2d 771 (1967) (per curiam) ("[t]he District Court [did not] articulate any satisfactory grounds for rejecting at least two other plans presented to the court, which respected county lines but which produced substantially smaller deviations from the principles of *Reynolds v. Sims.*"); *cf. Mahan,* 410 U.S. at 326, 93 S.Ct. at 986 (plan approved in part because "[t]here was uncontradicted evidence offered in the District Court to the effect that the legislature's plan, subject to minor qualifications, produces the minimum deviation above and below the norm, keeping intact political boundaries....").

Consistent with this case law, Plaintiffs focus their objections to the instant plan on the argument that it arbitrarily advances the defendants' stated policies. Having reviewed their specific objections, however, we find that they are inapposite. Plaintiffs' assertions of arbitrariness at best support the conclusion that Amendment D could have better effectuated certain districting goals, such as keeping townships in the same district, but these objections alone do not cast doubt on the state's advancement of its policy with respect to the whole-county districts that created the total deviation of greater than 10% here. Because the state policy at issue here is concerned narrowly with keeping together whole counties, and because the board has in fact preserved all whole counties within the applicable population limits, it cannot be said that the policy has been advanced arbitrarily.

The three state house districts that depart more than five percent from the ideal are

whole counties. The state senate district that deviates more than five percent is, likewise, composed of two counties—no more, no less. Except for these whole-county districts, the plan's total deviation falls below the 10% threshold that is necessary for the plaintiffs to prove a *prima facie* case of population disparity. Thus, we find the deviations at issue here are the result of line-drawing that reasonably advances the rational state constitutional policy.

### C. Whether the total deviation exceeds constitutional limits.

The final consideration to be addressed is whether the total deviations of 13.81% and 10.54% are constitutionally excessive. As the United States Supreme Court in *Brown* stated:

> Even a neutral and consistently applied criterion such as use of counties as representative districts can frustrate *Reynolds'* mandate of fair and effective representation if the population disparities are excessively high. "A State's policy urged in justification of disparity in district population, however rational, cannot constitutionally be permitted to emasculate the goal of substantial equality." *Mahan* [, 410 U.S. at 326, 93 S.Ct. at 986].

*Brown*, 462 U.S. at 845, 103 S.Ct. at 2697; *cf. Reynolds*, 377 U.S. at 581, 84 S.Ct. at 1391 ("Carried too far, a scheme of giving at least one seat in one house to each political subdivision (for example, to each county) could easily result, in many States, in a total subversion of the equal-protection principle in that legislative body."). In light of *Mahan*, the total deviations at issue in the instant case are not constitutionally excessive.

In *Mahan*, the Virginia legislature adopted an apportionment plan for state legislative districts that resulted in a total deviation of 16.4% with respect to the state house districts. As in the instant case, the justification offered for the deviation was the preservation of political subdivisions. The Supreme Court concluded:

Neither courts nor legislatures are furnished any specialized calipers that enable them to extract from the general language of the Equal Protection Clause of the Fourteenth Amendment the mathematical formula that establishes what range of percentage deviations is permissible, and what is not. The 16–odd percent maximum deviation that the District Court found to exist in the legislative plan for the reapportionment of the House is substantially less than the percentage deviations that have been found invalid in the previous decisions of this Court. *While this percentage may well approach tolerable limits, we do not believe it exceeds them.* Virginia has not sacrificed substantial equality to justifiable deviations.

*Mahan*, 410 U.S. at 329, 93 S.Ct. at 987 (emphasis added).

Other state-districting cases in which the Court has found a violation concerned higher total deviations than *Mahan*. *See Reynolds*, 377 U.S. at 549, 84 S.Ct. at 1375 (500 + % deviation) (approximate calculation from figures given); *Board of Estimate of City of New York v. Morris*, 489 U.S. 688, 701–02, 109 S.Ct. 1433, 1442, 103 L.Ed.2d 717 (1989) (78% deviation) (city districts); *Kilgarlin*, 386 U.S. at 122, 87 S.Ct. at 821 (26.48% deviation) (dicta); *Swann*, 385 U.S. at 442–43, 87 S.Ct. at 571 (25.65% deviation); *Chapman*, 420 U.S. at 22, 95 S.Ct. at 763 (20.14% deviation) (court-ordered plan); *Connor*, 431 U.S. 407 at 416–17, 97 S.Ct. 1828 at 1835, 52 L.Ed.2d 465 (19.3% house and 16.5% senate deviations). Likewise, deviations below the *Mahan* threshold have been found permissible. *See Abate*, 403 U.S. at 184, 91 S.Ct. at 1906 (11.9% deviation) (city boundaries); *Jenkins v. City of Pensacola*, 638 F.2d 1249, 1255 (5th Cir.) (14% deviation) (city districts), *cert. dismissed*, 453 U.S. 946, 102 S.Ct. 17, 69 L.Ed.2d 1033 (1981).

We can find no case holding that a total deviation—with respect to a legislative plan of apportionment of *state* legislative districts—of less than 16.4% is constitutionally excessive.[8] Thus, we hold that the total devi-

---

8. We note that in *Brown*, the Court upheld a total deviation that was much higher than even that in *Mahan*, approving Wyoming's placement of a state representative in a sparsely populated county that created a total deviation of 89%. The Court carefully narrowed its holding to the par-

ations of 13.81% and 10.54% are not excessive for purposes of the Equal Protection Clause of the Fourteenth Amendment. Under Ohio's constitutional scheme, it is possible that the preservation of whole-county districts could one day beget total deviations higher than those in Amendment D—and in fact as high as 20%, if a county exists that is 10% below the ideal population and another county exists that is 10% above. We express no view today on whether such higher total deviations would be excessive, for we need only decide that those in this plan are not.

## IV

In sum, we hold today that the Ohio reapportionment plan survives scrutiny under the one-person-one-vote guarantee of the Equal Protection Clause because (1) the defendants have advanced a genuine, rational state policy to justify the deviations from population equality among the state legislative districts; (2) their plan reasonably furthers the rational state policy; and (3) the 13.81% and 10.54% total deviations fall within constitutional limits. Accordingly, we enter judgment for the defendants on this issue.

**IT IS SO ORDERED.**

ticular fact situation, showing that the single representative did not greatly dilute the voting power of others in the state, since the *average* deviation between districts was 16%. 462 U.S. at 846–47, 103 S.Ct. at 2698. We also note that the Court has placed stricter limits on congressional reapportionment. In *Karcher v. Daggett,* 462 U.S. 725, 731–32, 103 S.Ct. 2653, 2659, 77 L.Ed.2d 133 (1983), the Court struck down New Jersey's *congressional* reapportionment plan even though the deviation was a minuscule 0.6984%. In that case, the Court found the state's asserted justification was so empty that it did not even justify the small deviation at issue.